**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

ESTATE OF MICHELLE EVETTE
MCCALL, et al.

      Plaintiffs,

v.                           Case No.: 3:07cv508/MCR/EMT

UNITED STATES OF AMERICA,

      Defendant.

_____/

## ORDER AND FINAL JUDGMENT

     This tragic case arises out of the death of a young mother, Michelle Evette McCall, after the delivery of her son, W.W., in February 2006, while in the care of Air Force medical personnel. The Estate of Michelle Evette McCall, by co-personal representatives, who are her parents, Edward M. McCall and Margarita F. McCall; and her son's father, Jason Walley; filed this action against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80. The case was tried to the court without a jury on August 31 and September 1, 2009. *See* 28 U.S.C. § 2402. On consideration of the evidence presented, the court now renders its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

**FINDINGS OF FACT**

     In February 2006, Michelle McCall was a bright, beautiful, and healthy, 20-year-old woman. She graduated from high school with honors and had attended one term of college at the University of Florida and a partial term at Florida State University before returning home to Ft. Walton Beach, Florida, in 2005 for medical treatment unrelated to this case. She subsequently returned to Florida State University but soon thereafter

withdrew and again returned home.[1]  In June 2005, while living at home with her parents and working, she maintained a relationship with her high school sweetheart, Jason Walley, and became pregnant.  Michelle obtained prenatal care at the Eglin Air Force Base clinic as an Air Force dependent and continued to live at home with her parents.  She elected to obtain her prenatal care and delivery services through the Air Force's family practice department as opposed to the OB/GYN department.[2]  Her pregnancy progressed without incident until February 16, 2006, when she attended a routine prenatal checkup and was seen by Captain (now Major) Marvin Sineath, a third-year family medicine resident at the clinic.  Since her last office visit, Michelle's blood pressure had increased considerably and she had gained six pounds.  She was instructed to collect a 24-hour urine sample and return it to the lab after the holiday weekend.  She did as instructed, and on Tuesday, February 21, 2006, test results revealed she had severe preeclampsia, a serious condition characterized by elevated blood pressure and an abnormal amount of protein in the urine and requiring immediate hospitalization for the induction of labor.  At this point, the otherwise normal pregnancy became a high risk pregnancy.[3]

Michelle was admitted to the Fort Walton Beach Medical Center on February 21, where she received care from Air Force medical personnel, including Dr. Sineath and his supervisor, family practice physician Major Brian Crownover.[4]  On admission, Michelle was

---

[1] College transcripts reflect that in the fall term of 2004 at the University of Florida, Michelle withdrew from one class and scored two Bs and one C in the classes she completed.  Spring term of 2005, she attended Florida State University, and records indicate that she withdrew mid-semester (in March), with a cumulative GPA of 0.  In August 2005, Michelle enrolled at Okaloosa Community College (OCC) in Fort Walton.  At the end of the fall semester at OCC, she had withdrawn from several classes; her GPA was 1.0.  At the time of her death, Michelle was working at Victoria Secret and not attending college.

[2] According to the trial testimony, Air Force dependents may consent to have their prenatal care followed, and their delivery attended, by a family practice physician in lieu of an obstetrician.

[3] The record does not reflect why at this point Michelle was not transferred to an OB/GYN physician for continuation of her obstetrical care.

[4] The Air Force Base hospital was temporarily unavailable for obstetric and delivery services.  The Air Force maintained control and supervision of all Air Force employees who provided obstetrics and labor services while temporarily housed at the Fort Walton Beach Medical Center.  At the Fort Walton Beach Medical Center, the Air Force had its own nurses' station, three or four hospital delivery rooms, and an on-call room for the Air Force medical personnel, all in close proximity to the private hospital's labor and delivery

given five milligrams of Hydralizine intravenously for hypertension.[5] Additional medication was given to induce labor and Michelle began laboring with mild contractions through the night. An epidural was placed for pain mid-morning on February 22. Examinations revealed that Michelle was four centimeters dilated and her contractions were noted to be adequate. A cervical examination in the afternoon revealed that she was five centimeters dilated, but her contractions had slowed and become inadequate. Drs. Sineath and Crownover discussed whether a cesarean delivery was warranted when Michelle's contractions slowed. They contacted Major Frank Archbald, an Air Force obstetrician, shortly after 5 p.m. concerning the possibility of him performing a cesarean section. Dr. Archbald, however, was performing another surgery and thus was not immediately available, but said he would come as soon as he finished. Michelle was then prepared for a cesarean section, but Dr. Sineath and Dr. Crownover did not call another obstetrician because Michelle appeared to be stable at that time. Captain (now Major) Said Acosta, a certified registered nurse anesthetist, arrived on his shift around 3:00 pm that afternoon and was told that Michelle had severe preeclampsia. He checked her epidural and observed her to be comfortable. Dr. Archbald arrived later, but by that time Michelle's labor had resumed, so she was allowed her to continue with a vaginal delivery instead of cesarean delivery, and Dr. Archbald left.

At 1:25 a.m. on Wednesday, February 23, 2006, Michelle delivered a healthy son, W.W., attended by Dr. Sineath and Dr. Crownover. Family members attending the birth were concerned with the amount of blood loss during the birth but were assured by medical personnel that Michelle was fine. At 1:30 a.m. Michelle's blood pressure was 180/92. Dr. Sineath and Dr. Crownover waited a period of time for the placenta to be delivered, but by 2:00 a.m., when the placenta had not delivered as expected, they began unsuccessful

---

department.

[5] Her blood pressure was 181/132.

attempts at manual extraction.[6]  Nurse Acosta was awakened to provide more epidural pain relief for Michelle during the attempted manual extraction, which can cause considerable pain.  When the epidural was no longer effective in controlling Michelle's pain, Nurse Acosta gave her two separate doses of Morphine intravenously, one at 2:09 a.m. and the other at 2:50 a.m.[7]  At 2:15 a.m., Michelle's blood pressure was reported at 137/75.  Nurse Acosta remained at Michelle's bedside throughout the doctors' attempts to manually extract the placenta and admits that his job was to monitor pain control and report Michelle's vital signs to the physicians.

When the manual attempts of Dr. Sineath and Dr. Crownover to remove the placenta proved futile, they called for assistance from Dr. Archbald, sometime between 2:30 and 2:40 a.m.  The medical records show that Michelle's blood pressure dropped considerably around that time.  At 2:31 a.m., her blood pressure was 125/80 but at 2:34 a.m., it dropped to 93/43; at 2:39 a.m., it dropped further to 86/36, and remained in this range for the next two and a half hours.  Nurse Acosta did not notify the attending physicians of the sudden decline in Michelle's blood pressure.  Dr. Archbald arrived at the hospital around 2:45 a.m.  Dr. Sineath and Dr. Crownover told him that Michelle had not lost a high volume of blood; they estimated 500 milliliters.[8]  Dr. Archbald successfully removed the placenta within five minutes and in doing so noticed serious lacerations on the vaginal wall needing repair. He worked for approximately an hour (until 3:50 a.m.) to repair the lacerations, during which time Nurse Acosta was present and monitoring Michelle's vital signs.  At 3:03 a.m., her blood pressure was 94/46; at 3:32 a.m. it was 90/36; and at 3:47 a.m. it was 88/34. Dr. Archbald testified he specifically asked for Michelle's vital signs several times during the repair and was told by Nurse Acosta that her vital signs were "stable."  According to Dr. Archbald, he was never advised of the specific

---

[6]  According to the medical testimony at trial, many women will spontaneously deliver the placenta within five to ten minutes following delivery of the baby and most will deliver the placenta on their own within thirty minutes.  If the placenta is still retained after thirty minutes, manual extraction is required.

[7]  She was given a 10,000 mg dose at 2:09 and another 4,000 mg dose at 2:50.

[8]  Dr. Archbald also was not advised of the decline in blood pressure.

pressures or heart rate, and was never told there was any change in Michelle's vital signs.[9] Dr. Archbald further testified he relied on Nurse Acosta to inform him of the vital signs and did not personally check them because his focus at the time was on the vaginal repair. The medical records indicate that at 4:00 a.m., Michelle's blood pressure was down to 71/35 and her heart rate had risen to 131 beats per minute.

Nurse Acosta readily admitted on the stand that Michelle's blood pressure was falling throughout this time, yet he did not advise Dr. Archbald, or the attending physicians, of the readings. Nurse Acosta's trial testimony on why he did not notify the physicians of the change in the pressure readings was unclear. At one point he stated he assumed her falling blood pressure was the result of the morphine he had administered, but he later admitted he did not know why he failed to report this information to the physicians and could not give a reason.

After completing the vaginal repair around 3:50 a.m., Dr. Archbald instructed Dr. Sineath to run a "stat" complete blood count and order two units of blood for transfusion if needed.[10] Dr. Archbald did this because, although he estimated Michelle lost 1000 milliliters of blood during the repair, he was unsure of the precise amount of blood Michelle had lost since delivery of the baby.[11] At approximately 4:00 a.m. Dr. Archbald returned to the nurses' station area to write his notes; Nurse Acosta went to sleep; and Dr. Sineath and Dr. Crownover were writing notes nearby. At some point, Dr. Crownover went home. Dr. Sineath did not order the complete blood count requested by Dr. Archbald until 4:30 a.m., and a nurse did not attempt to draw blood until 5:08 a.m. - over an hour after Dr. Archbald asked that it be done immediately. None of the physicians observed Michelle or personally checked her vitals between 4:00 a.m. and 5:00 a.m. At 5:08 a.m., when the nurse went

---

[9] Jason Walley, who was present in the room with Michelle from the time she delivered the baby until the time she coded testified he never heard Dr. Archbald ask for Michelle's vital signs.

[10] Dr. Archbald testified that by "stat" he meant immediately.

[11] Based on Dr. Crownover's and Dr. Sineath's blood loss estimate of 500 milliliters during delivery of the baby and attempts at manual extraction of the placenta, Dr. Archbald assumed a total blood loss of no more than 1500 milliliters, including the repair.

into the room to draw blood, Michelle was found to be unresponsive and an emergency code issued. Lifesaving measures were taken. Nurse Acosta intubated Michelle at 5:19 a.m., and four units of blood were ordered. Transfusion was begun at 5:30 a.m., but Michelle never regained consciousness. She was removed from life support a few days later and died at 10:23 p.m. on February 27, 2006. The death certificate lists the following events as leading to Michelle's death, with the final event resulting in her death: severe preeclampsia, vaginal delivery, hypovolemic shock, and anoxic enoephalopathy.

Dr. Archbald testified that had he known of Michelle's decreasing blood pressure and rising pulse, he would have ordered a blood transfusion immediately, and in his opinion, had this been done she most likely would have survived. He testified that a blood transfusion was indicated as early as 2:30 a.m., when, according to the hospital chart, Michelle's diastolic blood pressure dropped to approximately 40. Dr. Archbald stated that, in retrospect, his review of the entire circumstances confirms that Michelle suffered acute blood loss and that this was the likely cause of her shock and cardiac arrest. In his opinion, the factors contributing to the excessive blood loss were the delay in removing the placenta, the fact that the family practitioners were not aware of the severe vaginal-wall laceration, and the fact that pre-eclampsia made it difficult to recognize the blood loss. According to Dr. Archbald, the vaginal lacerations should have been obvious to an obstetrician with knowledge that the placenta had not delivered in the normal time, and that an obstetrician would repair such laceration immediately in order to reduce bleeding. Finally, Dr. Archbald testified that Nurse Acosta's characterization of Michelle's vital signs as "stable" between 2:50 a.m. and 4:00 a.m. was "totally inconsistent with the clinical picture at the time," that is, during the repair.

Dr. Crownover acknowledged the physicians should have been aware of Michelle's blood pressure readings and stated that if they had been aware of those readings from 2:30 a.m. through 5:00 a.m., at a minimum they would have requested an immediate complete blood count and possible transfusion. Dr. Crownover testified that a blood pressure of 90/50 is the cutoff for what is acceptable, below which there is cause for concern, particularly with regard to the diastolic pressure. According to the medical

records, Michelle's blood pressure fell below that mark around 2:30 a.m. Dr. Crownover also stated that a complete blood count is the most reliable way to rule out acute blood loss; yet this was not done until it was too late to be beneficial. Dr. Crownover acknowledged that the physician in charge should have been aware of Michelle's blood pressure readings and would have checked them himself had he been alerted to a concern but he relied on the nurses to give him correct vital signs information. He testified he would be concerned about the blood volume status of a patient with the intermittent drops in diastolic blood pressure reflected in Michelle's records. Dr. Crownover also admitted to being aware of the vaginal wall-lacerations at the time Michelle delivered her baby.

Dr. Sineath testified there was no emergency prior to the time Michelle went into cardiac arrest at 5:08 a.m. and no reason for him to believe she had suffered excessive blood loss.[12]

Plaintiffs presented the expert testimony of Dr. Jill Mauldin, a board certified obstetrician and associate professor of OB/GYN at the Medical University of South Carolina. According to Dr. Mauldin, during delivery of the baby, Michelle suffered a very severe laceration on the left side of her vaginal wall. Additionally, she had a retained placenta, and her uterus was not "clamping down" as necessary. Dr. Mauldin stated that these factors together confirmed Michelle's risk for significant blood loss, which the physicians should have recognized. According to Dr. Mauldin under these circumstances the standard of care for all the medical personnel involved in Michelle's care required them to monitor and be aware of all of her vital signs. Dr. Mauldin's opinion was (1) the physicians and staff failed to recognize the medical circumstances contributing to Michelle's blood loss; (2) the medical records confirm she in fact suffered significant blood loss;[13] because of the blood loss Michelle went into severe shock; and (4) the medical staff

---

[12] Dr. Sineath's notes - written at 8:25 a.m. - state that Michelle suffered acute blood loss.

[13] According to Dr. Mauldin, based on Michelle's lab work prior to delivery and at the time of her cardiac arrest she had a change of seven grams of hemoglobin, which equates to a blood loss of 2200 - 2500 milliliters, which was one liter more than the physicians estimated. Dr. Mauldin testified further that normally a pregnant woman has a blood volume of 5 liters (or 5,000 milliliters), which would mean that Michelle lost nearly half her blood volume between the time she delivered her baby and the time she coded. According to Dr. Mauldin, a loss of 35% - 40% is associated with moderate to severe shock.

failed to recognize significant changes in her vital signs indicative of shock between 2:00 a.m. and 5:00 a.m., and thus missed the opportunity for a blood transfusion, which would have saved Michelle's life.[14]

The Government did not offer an expert on liability.

**CONCLUSIONS OF LAW**

**Liability**

"Under the FTCA, the United States is liable for tortious conduct 'in the same manner and to the same extent as a private individual under like circumstances' after applying the applicable law in the same jurisdiction." *Turner ex rel. Turner v. United States*, 514 F.3d 1194, 1203 (11th Cir. 2008) (quoting 28 U.S.C. § 2674); *see Pate v. Oakwood Mobile Homes, Inc.*, 374 F.3d 1081, 1084 (11th Cir. 2004) ("The United States can only be found liable if a comparable private party would likewise be liable under [state] law."). The Eleventh Circuit has noted that "Congress' chief intent in drafting the FTCA was simply to provide redress for ordinary torts recognized by state law." *Turner*, 514 F.3d at 1203.

To prevail in a medical malpractice action in Florida, a plaintiff must identify the standard of care owed, produce evidence that the defendant breached the applicable standard of care, and demonstrate that the breach was the proximate cause of the alleged injury. *See id.* (citing *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984)); see also *Torres v. Sullivan*, 903 So. 2d 1064, 1067 (Fla. 2d DCA 2005). The plaintiff bears the burden of proving a breach of the "prevailing professional standard of care" for a particular health care provider "by the greater weight of the evidence." Fla. Stat. § 766.102(1). By statute, "[t]he prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." *Id.* Generally, the standard of care in a medical

---

[14] While Dr. Mauldin was certified as an expert in obstetrical care, not nursing standards, the court finds she was competent to testify about what, in her experience, an obstetrician can reasonably expect of attending medical staff. The court also finds that expert testimony was not necessary to establish Nurse Acosta's breach of the standard of care for reporting Michelle's vital signs as "stable" to Dr. Archbald. *See Atkins v. Humes*, 110 So. 2d 663, 665 (Fla. 1959). As Dr. Archbald made clear, this characterization by Nurse Acosta was "totally inconsistent with the clinical picture at the time."

malpractice action is established through expert testimony.  *See Pate v. Threlkel*, 661 So. 2d 278, 281 (Fla. 1995).   Although the state law provides the criteria for determining whether a person is competent to give expert testimony concerning the prevailing standard of care for a health care provider,[15] *see* Fla. Stat. § 766.102(5), there is an exception to this requirement in situations where "only the exercise of common sense and ordinary judgment are required."  *Stepien v. Bay Mem'l Med. Ctr.*, 397 So. 2d 333, 334 (Fla. 1st DCA 1981).  This exception applies where the medical provider's want of skill or lack of care "is so obvious as to be within the understanding of laymen," such that only common knowledge and experience are required to judge it.  *Atkins v. Humes*, 110 So. 2d 663, 665-66 (Fla. 1959) (stating ordinary intelligence and common sense may be sufficient to identify negligence in the actual performance of the treatment; i.e., a jury could find that it was negligent "to permit a wound to heal superficially with half a yard of gauze deeply imbedded in the flesh" without expert testimony).  Finally, to demonstrate proximate cause, the plaintiff must show "that what was done or failed to be done probably would have affected the outcome" or "that the injury more likely than not resulted from the defendant's negligence."  *Gooding*, 445 So. 2d at 1020.

The court finds that the appropriate standard of care for physicians was established by the plaintiffs' expert, Dr. Mauldin, who qualified as an OB/GYN specialist and expert in the field.[16]   The court accepts Dr. Mauldin's undisputed opinion that the physicians

---

[15] Ordinarily, state law governs substantive issues and federal law governs procedural issues, which generally include rules of evidence.  *McDowell v. Brown*, 392 F.3d 1283, 1294 (11th Cir. 2004) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)).  While the admissibility of expert testimony is a matter of federal rather than state procedure, some state evidentiary rules are substantive in nature, and this is especially true in medical malpractice cases, as here, where expert testimony is generally required to establish the standard of care.  *Id.* at 1294-95.  The federal court's duty in this context is first to ensure that the witness is competent under state law to testify to the substantive issue in the case, i.e., the standard of care, and then to perform the gatekeeping function of Federal Rule of Evidence 702 to ensure that the expert's causation theory meets federal evidentiary standards.  *Id.* at 1295.

[16] Dr. Mauldin is a licensed physician in South Carolina, and Associate Professor of OB/GYN at the Medical University of South Carolina, a physician clinical director of Prenatal Wellness, and a medical director of Perinatal Service Line.  (Plaintiffs' Ex. 2.)  She has authored numerous peer-reviewed publications in the specialty field of obstetrics and gynecology.  (*Id.*)  Dr. Mauldin's testimony was admitted as competent expert testimony regarding the standard of care for physicians attending a delivery, and her causation theory was not challenged as incompetent under federal standards.

attending Michelle during and after her delivery provided care below the standard required by physicians in these circumstances. The evidence is undisputed that delivery is the cure for preeclampsia, but instead of having an obstetrician perform a cesarean section at the earliest possible time, Dr. Sineath and Dr. Crownover permitted Michelle to undergo a lengthy vaginal delivery through which she suffered complicated lacerations to the vaginal wall.  The family medicine practitioners attending her delivery failed to recognize the lacerations.[17]  Further, their inability to remove the placenta and/or to call for the aid of an obstetrician for over an hour resulted in an increased loss of blood, as indicated by the dangerous drop in Michelle's diastolic blood pressure around 2:34 a.m.  The family medicine practitioners should have recognized the risk for significant blood loss from the vaginal lacerations and their prolonged attempts to manually extract the placenta.  By failing to do so they underestimated the amount of blood Michelle had lost and under reported the amount to Dr. Archbald when he arrived.  As a result, no hematocrit was done during the full hour it took for Dr. Archbald to do the vaginal wall repair.

Both Dr. Crownover and Dr. Archbald acknowledged that they should have been aware of Michelle's blood pressure readings and stated that had they been aware of those readings from 2:00 a.m. through 5:00 a.m., at a minimum, they would have requested an immediate complete blood count and possible transfusion.  Dr. Crownover admitted that a blood pressure of 90/50 is the cutoff for what is acceptable,[18] and Michelle's blood pressure fell below that mark around 2:34 a.m. He also stated that a complete blood count is the most reliable way to rule out acute blood loss; yet it was not done until it was too late to be beneficial.  All three doctors said they relied on the nurses to give them correct vital signs information and that they would have checked Michelle's vitals themselves had they been alerted to a concern.  Although a physician should be able to rely on staff for such information while performing a procedure, none of the physicians in this case physically

---

[17] Dr. Archbald testified that Dr. Sineath and Dr. Crownover were not aware of the serious lacerations; however, Dr. Crownover admitted he was aware of the lacerations at the time the baby was delivered.

[18] Dr. Crownover said he would be concerned about the blood volume status of a patient with the intermittent drops in diastolic blood pressure reflected in Michelle's records.

checked Michelle after the procedure or made any effort to be aware of her actual vital sign readings between 4:00 a.m. and 5:08 a.m., which they all admit in hindsight demonstrated a dangerous circumstance that required a complete blood count and transfusion well prior to the time she suffered cardiac arrest at 5:08 a.m.[19] Furthermore, Dr. Archbald instructed Dr. Sineath to order an immediate complete blood count and blood for a possible transfusion at approximately 4:00 a.m. when the surgical procedure was completed, but it was not ordered for another half an hour, and then another half an hour passed before a nurse went into the room to draw the blood, at which point she found Michelle unresponsive.  This was well over an hour after Dr. Archbald told Dr. Sineath to order the "stat" complete blood count.

The physicians' failure to be aware of Michelle's actual vital sign readings during and after this prolonged, high risk delivery, difficult placenta removal, and lengthy surgical procedure to repair the vaginal wall lacerations unquestionably fell below the standard of care.  Moreover, the court finds the doctors were, or should have been, aware of the obvious risk of significant bleeding presented by Michelle's medical course in the hospital, as outlined by Dr. Mauldin.  Their failure to recognize this risk led to their underestimation of Michelle's blood loss, which in turn led to their failure to perform a simple blood test, which would have alerted them to the need for a transfusion, which in turn would have saved Michelle's life.

The Government objected to the plaintiffs' attempt to designate Dr. Mauldin as an expert on nursing standard of care.  The court agreed that a foundation had not been laid to demonstrate that Dr. Mauldin was qualified to give expert opinion testimony regarding the standard of care applicable to nurses but permitted her to testify on the basis of her experience concerning that level of care a physician attending a delivery should be able to expect of the attendant medical staff, particularly that of a certified registered nurse anesthetist, who is a licensed medical professional and practitioner under Florida law, the same as a physician.  Dr. Mauldin testified that a physician should expect medical staff to

---

[19]  Michelle's blood pressure readings during this time were: 73/33 (3:57 a.m.); 71/35 (4:00 a.m.); 68/23 (4:27 a.m.); 79/28 (4:37 a.m.).

monitor the patient's vital signs and report them accurately.[20]  Nurse Acosta admitted that Michelle's blood pressure dropped and her heart rate increased; yet he did not report this condition to the physicians.  To make matters worse, Nurse Acosta not only failed to report the vital signs, he gave an inaccurate report to Dr. Archbald when he told him Michelle's vital signs were "stable."  The inaccuracy of this statement seems obvious to even a lay person.[21]

Additionally, the evidence, both medical records and physicians' testimony, readily supports a finding that earlier intervention with a blood transfusion would have saved Michelle's life.  Dr. Mauldin testified that Michelle went into shock due to acute blood loss caused by a documented significant change in hemoglobin, the difficulty delivering the placenta, and a severe laceration.  The combined failure of all medical staff in this instance to meet this standard of care caused the severe blood loss to go unrecognized, which in turn caused Michelle McCall to go into shock, leading to cardiac arrest and her ultimate death.  Simply and very sadly put, this young woman bled to death in the presence of all medical staff who were attending her.

The court finds that the medical staff attending Michelle were government employees, the greater weight of the evidence demonstrates that the medical care provided to Michelle fell below the prevailing professional standard for these health care providers, and their negligence proximately caused Michelle's death.  The Government, therefore, is liable to the plaintiffs for damages.

---

[20]  In Dr. Mauldin's opinion, however, this did not excuse Michelle's physicians of the responsibility to personally check on her condition, including her vital signs, for two and a half hours.

[21]  Nurse Acosta offered no explanation at trial for why he inaccurately reported Michelle's vital signs as stable.  Although at one point in his testimony he said he attributed the drop in blood pressure to the morphine, this doesn't explain why he reported the vital signs as "stable."  Further, the Government offered no expert testimony on the effect of morphine on blood pressure, particularly diastolic pressure.  Notably, Dr. Crownover was not willing to testify that the morphine administered to Michelle by Nurse Acosta played a part in lowering her blood pressures.  The only comment he made about this issue is that morphine can lower, but not raise, heart rate.

**Damages**

"The components and measure of damages in FTCA claims are taken from the law of the state where the tort occurred . . . ." *Bravo v. United States*, 532 F.3d 1154, 1160-61 (11th Cir. 2008) (internal marks omitted) (alteration in original), *reh'g & reh'g en banc denied, opinion adhered to and extended by*, 577 F.3d 1324 (11th Cir. 2009); *see also Richards v. United States*, 369 U.S. 1, 11 (1962) (concluding the FTCA requires "application of the whole law of the state where the act or omission occurred"). Florida's Wrongful Death Act, Fla. Stat. §§ 768.10-768.26, permits survivors to recover the value of lost support and services from the date of injury to the date of death, as well as the future loss of support and services from the date of death reduced to present value. Fla. Stat. § 768.21(1). A minor child of the decedent may also recover for lost parental companionship, instruction, and guidance and for mental pain and suffering. Parents of a deceased minor child may recover noneconomic damages for mental pain and suffering,[22] Fla. Stat. § 768.21(4), as well as economic damages for medical or funeral expenses paid, Fla. Stat. § 768.21(5). Finally, as relevant to this case, the estate may recover the loss of prospective net accumulations of the estate reduced to present money value. Fla. Stat. § 768.21(6)(a), (b).

The legislature intends "that the remedial provisions of the wrongful death statute should be liberally rather than strictly construed" in light of the legislative purpose and the public policy of Florida to shift the losses resulting from wrongful death away from the survivors and onto the wrongdoer. *BellSouth Tele., Inc. v. Meeks*, 863 So. 2d 287, 290 (Fla. 2003) (citing Fla. Stat. § 768.17). While the statute provides that the child's loss of support and services from the death of a parent may be limited to the child's minority, Fla. Stat. § 768.21(1), no such limitation is expressed in the statute regarding the child's pain and suffering from the loss of a parent, Fla. Stat. § 768.21(3). *See BellSouth Tele.*, 863 So. 2d at 291. The child's pain and suffering should be based on the joint life expectancies

---

[22] The Wrongful Death Act defines "minor children" as including children under 25 years old, regardless of the age of majority. Fla. Stat. § 766.18(2).

of the child and the deceased parent[23] because "it would be expected that a child would lose his or her parents due to natural causes during the child's lifetime." *BellSouth Tele.*, 863 So. 2d at 292. Likewise, the relevant statute does not limit the pain and suffering incurred by a parent from the loss of a minor child to the child's remaining minority years, § 768.21(4), and that calculation should instead be measured based on the life expectancies of the parents.[24] *BellSouth Tele.*, 863 So. 2d at 292 (citing *Gross Builders, Inc. v. Powell*, 441 So. 2d 1142 (Fla. 2d DCA 1983)). Pain and suffering may be lifelong. *Id.* at 292. While there is some element of arbitrariness involved in fairly assessing pain and suffering, the court is mindful that "damages cannot be based on mere guesswork or speculation but must have an evidentiary basis." *McQueen*, 909 So. 2d at 495. Noneconomic damages for pain and suffering must bear some reasonable relation to the facts, the status of the parties, the amount allowed for compensatory damages, and the general trend of decisions in similar cases. *See Bravo*, 532 F.3d at 1162; *Johnson v. United States*, 780 F.2d 902, 907-08 (11th Cir. 1986) (quoting *Fla. Dairies Co. v. Rogers*, 161 So. 85, 88 (Fla. 1935), and *Gresham v. Courson*, 177 So. 2d 33, 39-40 (Fla. 1st DCA 1965)). The plaintiffs submitted a list of noneconomic damages awards in other cases, which the court has considered, along with several others.

Jason Walley, for the benefit of W.W.

The plaintiffs' vocational specialist and certified life care planning expert, Larry Forman, made calculations to bring to present value the loss of Michelle's past and future services to her son. His calculations included an amount of $5,229.00 for W.W. to attend play therapy to learn to deal with his mother's death and for his father Jason Walley to receive education regarding how to counsel W.W. about the loss of his mother. The

---

[23] The record does not contain the life expectancy rates for the decedent or the child, but mortality tables are but one of many factors that may be considered in estimating life expectancy and deciding the amount of damages. *See McQueen v. Jersani*, 909 So. 2d 491, 496 & n.3 (Fla. 5th DCA 2005). The trier of fact may consider testimony regarding their general health, lifestyle and activities. *Id.*

[24] The record does not contain the life expectancy rates for Michelle's parents, but the trier of fact is permitted to assess life expectancy based upon their testimony and appearance at trial without the aid of expert testimony. *See McQueen*, 909 So. 2d at 496.

Government's expert, Dr. Scott Benson, board certified in pediatrics, psychiatry, child psychiatry, and forensic psychiatry, concluded that W.W. will not require play therapy or counseling.  While the court is not unsympathetic to the emotional toll that Michelle's untimely death will have on W.W. as he grows, based on his age at the time of his mother's death, the court cannot find by the greater weight of the evidence that play therapy for W.W. or special counseling education for his father will be necessary, and the court thus has deducted that amount from Mr. Forman's calculations.

The plaintiffs' economist, Dr. Frederick Anthony Raffa,[25] calculated the loss of financial support (and loss of net accumulations to the estate) by assuming, according to Mr. Forman's conclusions, that Michelle would have finished college.  However, the court concludes that the greater weight of the evidence does not support a finding that Michelle would have obtained a four-year college degree.  Although she did well in high school, the poor academic record and spotty attendance history reflected in her college transcripts (*see* footnote 1 above), as well as Jason Walley's testimony that Michelle planned to move with him to North Carolina to take care of the baby and continue working at Victoria Secrets strongly suggest she would not have returned to college any time soon.  While it is possible she might have returned to college at some time late in her life, based on the evidence presented, it would be sheer speculation for the court to base economic damages on the fact that she would have obtained a college degree.  Therefore, the court has reduced the requested amount for loss of financial support to 60% of the original calculations, in

---

[25] Dr. Raffa has a Ph.D. in economics, with concentrations in labor economics and macroeconomics. He also has a Bachelors degree and a Masters degree in business administration, with concentration in finance.  He was an assistant professor, associate professor, and professor in the department of economics at the University of Central Florida from 1969 through 1998.

accordance with Dr. Raffa's testimony.[26]  In all other respects, the court adopts the findings of Mr. Forman and Dr. Raffa regarding the economic damages due to W.W.[27]

Accordingly, to compensate for economic damages to the minor child of the deceased, the court awards Jason Wally for the benefit of W.W. a total of $705,234.00 for the combined loss of past ($147,127.00) and future ($558,107.00)[28] household and related services.  The court additionally awards Jason Walley for the benefit of W.W. $235,000.00 for the loss of financial support due to the death of his mother.

Turning to noneconomic damages, the court notes that W.W., who is now a healthy and active 3 ½ year-old boy, has been deprived the privilege of ever knowing his mother, of having her comfort and emotional support throughout his and her shared lifetimes, and of benefitting from her guidance and companionship.[29]  The negligent conduct in this case occurred within a matter of hours of his birth, but it leaves for W.W. a void in his life that will never truly be filled.  His pain and suffering are difficult to quantify, but no one disputes the magnitude of his loss.  On the other hand, the court is mindful that W.W.'s pain is necessarily tempered by his age at the time of his mother's death.  He lives with the pain of never knowing her, but not with the pain that comes from suddenly losing the love and

---

[26]  Dr. Raffa testified that without a college degree, Michelle's earnings would have been only about 60% of what he originally assumed and that using this 60% value, the loss of financial support would equal $235,000.00.

[27]  The government presented the calculations of Jeff DeWeese, a certified public accountant with Bachelors degrees in accounting and finance.  Although certainly well qualified in those areas, Mr. DeWeese is not a certified life care planning expert.  To the extent he disagreed with the assumptions of plaintiffs' life care expert, Larry Forman, regarding lost household services and the amount of time that would have been available to Michelle to provide those services, the court elects to credit the testimony of Mr. Forman, as the only certified life care planning expert who testified in the case.  The court nevertheless agrees with Mr. DeWeese's conclusion that the economic calculations for lost financial support should not include an assumption that Michelle would have obtained a four-year college degree.

[28]  This amount is a result of the following calculations:  Dr. Raffa testified that the present value of lost future services was $561,336.00, if the trial took place in March 2009.  From this, the court subtracted $5,229.00, the sum Mr. Forman and Dr. Raffa included for play therapy and counseling education.  The court then added $2,000.00, an amount Dr. Raffa testified would be needed to make up for the unnecessary present value discount for lost services during the six-month period between the initially expected trial date of March 2009 and the actual trial in September 2009.

[29]  The court measures this amount by considering the joint life expectancy of the child and the deceased parent.  *See BellSouth Tele.*, 863 So. 2d at 292.

companionship of a parent one has bonded with emotionally. W.W.'s life, while shadowed by this tragedy, will be lived with the love of those who have surrounded him from infancy–his father and his grandparents–not the pain of a conscious memory of his mother's death.  The court does not intend to minimize the loss of one's mother; such is an obvious and enormous loss.  The court simply finds that the pain and suffering for W.W. is tempered by his infancy at the time of his mother's death, a factor that should be reflected in the noneconomic damage award.  To compensate for W.W.'s loss of parental companionship, instruction, and guidance and for his mental pain and suffering, the court awards $500,000.00.

Estate of Michelle McCall

Dr. Raffa calculated the present value of net accumulations lost to the estate at $51,254.00, but he also testified that absent a college education, the expected income would be roughly 60% of his calculation.  The court has reduced the amount based on Dr. Raffa's testimony and the speculative nature of a college degree for Michelle.  For the loss of net accumulations to the estate, reduced to present value, the court awards $30,752.40.

Mr. and Mrs. McCall

Mr. McCall is entitled to the funeral expenses he paid on account of Michelle's death, and these are evidenced by receipts in the record.  To cover these expenses, the court awards Mr. McCall $9,476.00.

There is no question, as shown by the evidence, that Mr. and Mrs. McCall were both very close to their daughter and that this tragedy has greatly impacted the quality of their lives, emotionally as well as physically.  They were otherwise healthy, active, and excited about helping their daughter and new grandson.  They went to the hospital with the happy and hopeful expectation of bringing their daughter home with a healthy baby but instead found themselves faced with the agonizing decision of whether to remove life support from her.  Mr. McCall struggled as he recounted their hope of Michelle possibly regaining consciousness as they laid W.W. across her before she died, and also so they could have one photograph of her "holding" her baby before she died.  The pain from the loss of their only daughter and the mental agony of having to make the decision to remove her from life

support will not soon abate, if ever in their lifetimes.  The court takes into consideration, however, that because of their relationship as  a married couple, they will both undeniably benefit from each other's noneconomic damage award.

For the pain and suffering of Edward M. McCall, II, the court awards $750,000.00.

For the pain and suffering of Margarita F. McCall, the court awards $750,000.00.

Damages Caps

Florida common law does not impose a statutory limit on the amount of economic damages that may be awarded in a negligence case, but the Florida legislature has enacted limits on the recovery of noneconomic damages in a medical malpractice suit such as this.  *See* Fla. Stat. § 766.118.  The parties do not dispute that this cap applies equally in the FTCA context.[30]  Noneconomic damages consist of nonfinancial losses, "including pain and suffering, inconvenience, . . . mental anguish, . . . loss of capacity for enjoyment of life, and other nonfinancial losses to the extent the claimant is entitled to recover such damages under general law, including the Wrongful Death Act."  Fla. Stat. § 766.202(8) (incorporated in Fla. Stat. § 766.118(1)(b)).  Section 766.118 caps noneconomic damages for medical malpractice in two separate categories, providing separate limitations for claims against practitioners and claims against nonpractitioners.   As relevant to this case, noneconomic damages for wrongful death against all practitioners (a term including physicians as well as certified registered nurse anesthetists)[31] are capped at $1 million,

---

[30]  While there is no disagreement between the parties on this point, the court notes that the proposition is well supported by case law.  The Eleventh Circuit has plainly stated that the FTCA's express provision that the government is liable to the same extent as a private party "applies to any limitation on damages." *Scheib v. Fla. Sanitarium & Benev. Ass'n*, 759 F.2d 859, 864 (11th Cir. 1985). *See also Richards*, 369 U.S. at 11-16 (indicating that the state's whole law applies, including its choice of law rules and statutory damages caps); *Cibula v. United States*, 551 F.3d 316, 321 (4th Cir. 2009) (holding that a state statute that affects the government's ultimate liability is to be applied as substantive state law under the FTCA); *Carter v. United States*, 333 F.3d 791, 794 (7th Cir. 2003) (holding that it was sensible for state law to consider state law damages cap as substantive because the cap reflects a judgment about the severity of the sanction appropriate to regulate the potentially injurious activity, and that even if the state court considered a damages cap as procedural, the federal courts would not), *cert. denied*, 540 U.S. 1111 (2004).

[31]  The term "practitioner" includes any person licensed under Florida Statutes chapter 458 (Medical Practice) or certified under section 464.012 (providing for the certification of certain advanced registered nurse practitioners, including certified registered nurse anesthetists), among others, and any entity whose liability is based solely on the actions of a practitioner.  Fla. Stat. § 766.118(1)(c).

"regardless of the number of claimants." Fla. Stat. § 766.118(2)(b); *see also* Fla. Stat. § 766.118(2)(c) ("The total noneconomic damages recoverable by all claimants from all practitioner defendants under this subsection shall not exceed $1 million in the aggregate."). Noneconomic damages for wrongful death against nonpractitioners are capped at $1.5 million. Fla. Stat. § 766.118(3)(b); *see also* Fla. Stat. § 766.118(3)(d) ("The total noneconomic damages recoverable by all claimants from all nonpractitioner defendants under this subsection shall not exceed $1.5 million in the aggregate").

Plaintiffs argue they are entitled to a total of $2.5 million in noneconomic damages – that is, $1 million in the aggregate against the practitioners and an additional $1.5 million in the aggregate against the nonpractitioners. Although plaintiffs assert in their complaint that all medical staff responsible for Michelle's care were negligent, they do not mention any particular nurses or hospital staff by name except for the physicians.[32] Similarly, no evidence at trial singled out a specific nonpractitioner for negligent conduct. Thus, based on the record, the court cannot find by the greater weight of the evidence that a nonpractitioner's negligence caused Michelle's death.[33]

Accordingly, noneconomic damages in this case are capped at $1 million in the aggregate. This amount will be equitably divided among the eligible survivors in proportion to their respective awards.

## MOTION FOR PARTIAL SUMMARY JUDGMENT

The plaintiffs filed a motion for partial summary judgment challenging the constitutionality of Florida's cap on noneconomic damages in medical malpractice actions, *see* Fla. Stat. § 766.118. The court deferred ruling on this motion until after making a determination on liability. Now, having determined that the Government is liable for

---

[32] Plaintiffs' administrative complaint also did not identify a specific nonpractitioner as negligent.

[33] Although the evidence at trial demonstrated negligence on the part of Nurse Acosta, he is a certified registered nurse anesthetist, and, thus, a practitioner under the statute. *See* Fla. Stat. § 464.012.

damages, it is appropriate and necessary to address this legal question.[34]  *See Cooper v. Dillon*, 403 F.3d 1208, 1213 (11th Cir. 2005) (noting the constitutionality of a statute is a question of law).

Florida law limits the amount of noneconomic damages that may be awarded in a medical malpractice action as follows:

> (2)(a)  With respect to a cause of action for personal injury or wrongful death arising from medical negligence of practitioners, regardless of the number of such practitioner defendants, noneconomic damages shall not exceed $500,000 per claimant.[35]
>
> (b)  Notwithstanding paragraph (a), if the negligence resulted in a permanent vegetative state or death, the total noneconomic damages recoverable from all practitioners, regardless of the number of claimants, under this paragraph shall not exceed $1 million. . . .
>
> (c)  The total noneconomic damages recoverable by all claimants from all practitioner defendants under this subsection shall not exceed $1 million in the aggregate.

---

[34]  The court hesitates to proceed on the question of whether Florida's statute establishing aggregate caps on noneconomic damages in a medical malpractice wrongful death action comports with several principles of state constitutional law; this appears to be a novel question of state law that the Supreme Court of Florida has not yet addressed.  It is the province of the state courts to authoritatively construe state legislation.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 577 (1996).  "Until state courts definitively construe the statute, [federal courts] are reluctant to interpose a constitutional ruling based upon our intuitive perception of unsettled [state] law issues."  *Red Bluff Drive-In, Inc. v. Vance*, 648 F.2d 1020, 1034 (5th Cir. 1981) (binding authority under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc)). The procedure of certifying a question to the state supreme court has been found useful in such instances to avoid the risk of "'friction-generating error'" when a federal court must construe a novel question of state law that has not been decided by the state's highest court.  *See Pittman v. Cole*, 267 F.3d 1269, 1289 (11th Cir. 2001) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997)).  However, neither the Florida Constitution nor Florida's rules of procedure permit the Supreme Court of Florida to accept a question certified for review by a United States district court.  *See* Fla. Const. art. V, § 3(b) (providing discretionary proceedings to review certified questions only from the United States Supreme Court or a United States court of appeals); Fla. R. App. P. 9.150 (same).

[35]  "Claimant" is defined as "any person who has a cause of action for damages based on personal injury or wrongful death arising from medical malpractice."  Fla. Stat. § 766.202(1).  The Wrongful Death Act states a wrongful death action shall be brought by the personal representative of the estate, who shall recover for the benefit of the survivors and the estate.  Fla. Stat. § 768.20.

Fla. Stat. § 766.118(2).[36]  To summarize the provisions relevant to this case, noneconomic damages for each occurrence of medical negligence by a practitioner resulting in a wrongful death are subject to a $500,000 cap per claimant, Fla. Stat. § 766.118(2)(a), and each occurrence of wrongful death due to the medical negligence of a practitioner is further subject to a $1 million total limit on noneconomic damages, which expressly applies "in the aggregate," Fla. Stat. § 766.118(2)(c), and "regardless of the number of claimants," Fla. Stat. § 766.118(2)(b).  The legislature's intent to limit claimants' noneconomic damages in the aggregate is plain and explicit.

The plaintiffs assert that the statute's requirement that the cap be applied in the aggregate is unconstitutional under various provisions of the Florida Constitution and United States Constitution on the ground that the statute does not permit full recovery by each claimant.  Because the Florida Supreme Court cannot accept a question certified for review by a United States district court, *see* footnote 1 above, this court proceeds by looking to the decisions of the Florida courts for guidance.  The Florida Supreme Court "is the ultimate arbiter of the meaning and extent of the safeguards provided under Florida's Constitution." *State v. Kelly*, 999 So. 2d 1029, 1042 (Fla. 2008); *see also Gore*, 517 U.S. at 577 (recognizing "only state courts may authoritatively construe state statutes").  Where the state supreme court has not yet spoken on an issue, this court follows the decisions of the state's intermediate appellate courts, unless there is persuasive indication that the state's highest court would decide the issue differently. *Galindo v. ARI Mut. Ins. Co.*, 203 F.3d 771, 775 (11th Cir. 2000).  Absent direction from the state courts, this court looks "to all available data," including all that is known about the state court's decision-making methods, and draws a conclusion that it believes the state court is most likely to adopt in the future.  *See Bravo,* 577 F.3d 1324, 2009 WL 2357016, at *2 (11th Cir. Aug. 3, 2009) (citing *Putman v. Erie City Mfg. Co.*, 338 F.2d 911 (5th Cir. 1964)).

---

[36]    This statute applies to medical negligence of a practitioner.  A similar provision applies to nonpractitioners, capping their liability at $750,000 per claimant and, in the case of a permanent vegetative state or death, at $1.5 million in the aggregate for all claimants against all nonpractitioner defendants.  *See* Fla. Stat. § 766.118(3)(a), (b), (d).

Case No.: 3:07cv508/MCR/EMT

When considering the constitutionality of a statute, the Florida Supreme Court begins with the familiar premise that all laws are presumed constitutional. *See Fla. Dep't of Educ. v. Glasser*, 622 So. 2d 944, 946 (Fla. 1993). The Florida Supreme Court abides by the following basic principles: the court's function is to interpret the law, not legislate; the wisdom of policy is of no concern as long as the legislation "squares with the Constitution;" the court has no power to strike down legislation unless the provisions violate the state constitution; and it is the court's duty to adopt a construction that will sustain the legislation if it can be rationally harmonized with the state constitution. *Holley v. Adams*, 238 So. 2d 401, 404 (Fla. 1970). A party who challenges the constitutionality of a statute bears a heavy burden because "unconstitutionality must appear beyond all reasonable doubt before an Act is condemned." *Bonvento v. Bd. of Pub. Instr. of Palm Beach County*, 194 So. 2d 605, 606 (Fla. 1967); *see also Ellis v. Hunter*, 3 So. 3d 373, 378-79 (Fla. 5th DCA 2009).

<u>Fair Compensation</u>

The plaintiffs first contend that the aggregate statutory noneconomic damages cap violates Article I, Section 26(a), of the Florida Constitution, entitled "Claimant's right to fair compensation." This section provides that "[i]n any medical liability claim involving a contingent fee, the claimant is entitled to receive no less than 70% of the first $250,000 in all damages received by the claimant . . . regardless of the number of defendants," and "[t]he claimant is entitled to 90% of all damages in excess of $250,000, . . . regardless of the number of defendants." Fla. Const. art. I, § 26(a). The plaintiffs assert that because this provision requires them to receive the specified percentages of "all damages" awarded to them, any cap on the available damages is therefore unconstitutional. No Florida Supreme Court decision or appellate court decision has addressed this question.

When interpreting rights under the state constitution, the Florida Supreme Court "make[s] a common sense reading of the plain and ordinary meaning of the language to carry out the intent of the framers as applied in the context of our times." *Shriners Hosp. for Crippled Children v. Zrillic*, 563 So. 2d 64, 67 (Fla. 1990). By its plain terms and a common sense reading of this right, the provision acts as a restriction on the amount of

attorney's fees that may be collected in a medical malpractice case, not as a definition of what amount of damages are in fact recoverable. The plaintiffs' reliance on *In re Advisory Opinion to the Attorney Gen. re the Med. Liab. Claimant's Comp. Am.*, 880 So. 2d 675 (Fla. 2004), does nothing to further their argument. In that case, the Florida Supreme Court was called on to review the proposed constitutional amendment adding this provision, but the court did not comment on the meaning of the amendment or its proper construction; the court was limited to considering only whether the proposed amendment satisfied the single-subject requirement and whether the ballot titles were printed in clear and unambiguous language. *Id.* at 676-77. Moreover, one dissenting justice expressly cautioned that if this constitutional amendment was adopted, all of the current damages caps and the expensive presuit process would remain in effect. *Id.* at 684-85 (Lewis, J. dissenting).

The plaintiffs cite one state trial court decision rejecting the damages caps of Fla. Stat. § 766.118 as unconstitutional on the ground that Article I, § 26(a) guarantees claimants the right to collect the stated percentages of "all of the damages that a jury could potentially award." *Cavanaugh v. Cardiology Assoc. of Orlando, P.A.*, No. 06-CA-3814, Div. 40 (Fla. 9th Jud. Cir. Ct. Oct. 30, 2007). Although the court has considered the trial court's ruling in *Cavanaugh*, it respectfully declines to follow it, as the court's analysis focuses on an isolated phrase in the provision rather than on the language of the section as a whole. The court also notes it is not bound by the *Cavanaugh* decision. *See Bravo v. United States*, No. 06-13052, 2009 WL 2357016, at *2 (holding federal courts are bound to follow intermediate state appellate court decisions unless there is persuasive evidence that the state's highest court would rule otherwise). Absent authority from the Florida Supreme Court or its intermediate appellate courts, this court may "make an educated guess as to how the Florida courts would resolve the issue." *Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1119 (11th Cir. 1990). In light of the strong presumption that a statute is constitutional, this court is persuaded that the Florida Supreme Court would not invalidate the noneconomic damages caps as a violation of Article I, Section 26(a), because the caps were in existence prior to the passage of this constitutional provision,

and a common sense reading of the right as a whole indicates it is aimed at protecting litigants against large contingency fees, not defining damages that may be awarded. The plain language of the statutory limitation on noneconomic damages is not inconsistent with the protection afforded by Article I, Section 26(a).

Access to the Courts

The plaintiffs also assert the statutory caps violate their right of access to the courts as guaranteed by the Florida Constitution, Article I, Section 21, which provides in part that "[t]he courts shall be open to every person for redress of any injury."[37] The "seminal case" for challenges to the right of access to the courts under the Florida Constitution is *Kluger v. White*, 281 So. 2d 1, 4 (Fla. 1973). Under *Kluger*, where a right of access to the courts for a particular injury has been provided by statute or common law prior to the adoption of the state constitution's Declaration of Rights, the right to redress may be abolished by the legislature only upon demonstration of (1) a reasonable alternative to protect the right to redress for injuries, or (2) a legislative showing of both an overpowering public necessity for the abolishment of the right and that no alternative method of meeting the public necessity can be shown. *Id.*; *see Univ. of Miami v. Echarte*, 618 So. 2d 189 (Fla.) (applying *Kluger* in the context of a medical malpractice arbitration proceeding arising out of a personal injury and holding a statutory cap on noneconomic damages did not violate the right of access to the courts), *cert. denied,* 510 U.S. 915 (1993) .

As a predicate to applying the *Kluger* analysis, there must be a showing that the statute at issue abolished a right that existed prior to the adoption of the state constitution's Declaration of Rights. "An action for wrongful death was not authorized at common law, and is a creation of the legislature." *White v. Clayton*, 323 So. 2d 573, 575 (Fla. 1976).

---

[37] The plaintiffs assert that the caps also violate their right to trial by jury under Article I, Section 22, of the Florida Constitution. However, because this is an FTCA case, the plaintiffs had no right to trial by jury in the first place, and the court therefore has no occasion to consider the issue. *See* 28 U.S.C. § 2402. Although there is no claim that the statute violates the federal Constitution's Seventh Amendment right to trial by jury, the court nonetheless notes that such claims have been uniformly rejected by federal courts. *See, e.g., Smith v. Botsford Gen. Hosp.*, 419 F.3d 513, 519 (6th Cir. 2005), *cert. denied*, 547 U.S.1111 (2006); *Davis v. Omitowoju*, 883 F.2d 1155, 1165 (3d Cir. 1989); *Boyd v. Bulala*, 877 F.2d 1191, 1196 (4th Cir. 1989).

Although it is not completely free from dispute, it appears there existed a statutory right to the loss of consortium for parents and children prior to the state's readoption of its Constitution and Declaration of Rights in 1968. *See Martin v. United Sec. Severs., Inc.*, 314 So. 2d 765, 767-68 (Fla. 1975) (noting that prior statutory actions involving a wrongful death included the elements of damages of a parents' claim for pain and suffering as well as a child's claim for loss of care, comfort and companionship from the death of a parent, and citing references dating prior to 1968). *But see Lifemark Hosp. of Fla. v. Afonso*, 4 So. 3d 764, 769 (Fla. 3d DCA 2009) (rejecting an access to the courts challenge, noting that the survivor's right to recover pain and suffering did not become part of the Wrongful Death Act until 1972). Thus, the *Kluger* analysis applies in this case because the legislature's decision to cap noneconomic damages in the wrongful death context abolished a portion of the previously unrestricted right to redress for this harm. Addressing the *Kluger* standard, the court finds the first prong is not satisfied because, although the caps are part of an overall legislative reform that benefitted Florida citizens as a whole, there is no reasonable alternative to the caps which would protect the injured plaintiff's right to redress for noneconomic damages that may exceed the statutory caps. The court, however, finds *Kluger's* second prong is satisfied. Under the second prong, the court must consider whether there is a legislative showing of both an overpowering public necessity for the abolishment of the right to redress and that no alternative method of meeting the stated public necessity can be shown. *Kluger*, 281 So. 2d at 4.

The legislative findings and intent accompanying the 2003 legislation and the January 2003 Governor's Select Task Force on Healthcare Professional Liability Insurance (doc. 25-2) ("Task Force"), which formed the basis of those findings, indicate that at the time this legislation was being drafted, a crisis in the availability and affordability of healthcare liability insurance in Florida was adversely affecting patient access to medical

care.[38] (*See* Task Force, at 1.) The legislation summary provided to the governor after the bill passed both legislative chambers states:

> Testimony, documents and affidavits presented to the Legislature during the past year and reports by the House Select Committee on Medical Liability Insurance and the Governor's Select Task Force on Healthcare Professional Liability Insurance have established that Florida is in the midst of a medical malpractice insurance crisis that threatens the quality and availability of health care for all Florida citizens. Based on this record, this bill provides findings that making high quality health care available, ensuring physicians continue to practice, and ensuring the availability of affordable professional liability insurance to physicians are overwhelming public necessities.

(Doc. 20-10, Plaintiffs' Ex. 9.) According to the summary, the bill is a comprehensive response to the crisis; in that, it provides improvements in patient safety, practitioner discipline, insurance reform, and litigation reform. (*Id.*) Notably, the Task Force specifically found that the crisis arose from the absence of a limit on the amount of noneconomic damages that may be awarded in medical malpractice cases in Florida.

---

[38] The legislative findings, in part, include the following:

(1) The Legislature makes the following findings:
(a) Medical malpractice liability insurance premiums have increased dramatically in recent years, resulting in increased medical care costs for most patients and functional unavailability of malpractice insurance for some physicians.
(b) The primary cause of increased medical malpractice liability insurance premiums has been the substantial increase in loss payments to claimants caused by tremendous increases in the amounts of paid claims.
(c) The average cost of a medical negligence claim has escalated in the past decade to the point where it has become imperative to control such cost in the interests of the public need for quality medical services.
(d) The high cost of medical negligence claims in the state can be substantially alleviated by requiring early determination of the merit of claims, by providing for early arbitration of claims, thereby reducing delay and attorney's fees, and by imposing reasonable limitations on damages, while preserving the right of either party to have its case heard by a jury.
(e) The recovery of 100 percent of economic losses constitutes overcompensation because such recovery fails to recognize that such awards are not subject to taxes on economic damages.

Fla. Stat. ch. 766.201. A report of the American Medical Association issued in April 2002 "declar[ed] Florida one of the twelve states in the midst of a medical liability insurance crisis." (Task Force, at 1.) The Governor's Select Task Force was created in August 2002 to examine the crisis and make recommendations to protect the citizens' access to high-quality and affordable healthcare. The Task Force made findings and recommendations, among which was its finding that absent corrective action, "this crisis will lead to the continued deterioration of patient access to medical care." (*Id.*)

(Task Force, at 213.)  The Task Forced noted that the unpredictability in noneconomic damages awards, due to their inherently subjective nature and the lack of any objective standards guiding how they are to be quantified (*id.* at 214), made the cap "essential to the success of any reform plan that might be adopted toward reducing the exposure of healthcare providers to the risk of severe jury awards" (*id.* at 213).  Further, the Task Force identified benefits to claimants as a result of the reform, such as an increased willingness on the part of physicians to perform higher risk services, an overall increase in laws and rules designed to assure the quality of healthcare services, and reduced time for plaintiffs to resolve disputes and obtain awards.  (*Id.* at 215-16.)  It is clear from these factors the Florida legislature identified an overpowering public necessity for limiting noneconomic damages awards in medical malpractice cases prior to passing the cap.

The plaintiffs argue that the legislative findings are clearly erroneous and thus not entitled to deference.  In support of their argument, they assert the legislative debate on the 2003 legislation exposed a fallacy in the claim that a medical malpractice crisis existed. As the plaintiffs' argument makes clear, the legislature *debated* these issues and considered the evidence before making a rational policy choice.  This satisfies the court's inquiry.  "The Legislature has the final word on declarations on public policy, and the courts are bound to give great weight to legislative determinations of facts." *Echarte*, 618 So. 2d at 196.  "The Legislature's factual and policy findings are presumed correct," *id.*, and nothing in this record or elsewhere persuades the court otherwise.

The plaintiffs also assert the legislature failed to demonstrate that no alternative method of meeting the public necessity existed.  They suggest the legislature could have enacted tax breaks or offered other financial aid to help physicians meet the escalating cost of malpractice insurance.  Nonetheless, even if this is true, as previously noted, this policy debate is best left to the legislature.  *See id.*  Also, the court must consider the plan enacted by the legislature as a whole. *See id.* at 197.  The limit on noneconomic damages is but one part of a comprehensive plan under which the legislature considered and addressed many facets of a state-wide healthcare problem, including issues relating to patient safety, practitioner discipline, insurance reform, as well as litigation reform.  The

noneconomic damages limitation for medical malpractice claims was but one piece of the overall solution to the crisis. The court cannot conclude that a reasonable alternative to the remedy chosen by the legislature existed.

This analysis and decision is consistent with the Florida Supreme Court's decision in *Echarte*. In 1993, the Florida Supreme Court held constitutional a 1988 statutory cap on noneconomic damages for personal injury due to medical negligence in an arbitration proceeding. *See Echarte*, 618 So. 2d at 194-98. Analyzing the access to courts claim within the framework of *Kluger*, the *Echarte* court held first that there was a commensurate benefit from the arbitration proceeding to justify abolishing the right to unrestricted damages, satisfying the first prong of *Kluger. Id.* at 194-95. The court also concluded that even if there was no commensurate benefit, the arbitration caps satisfied the second prong of *Kluger*, because the legislature had demonstrated that it enacted the statute to meet an overpowering public necessity, namely, "the current medical malpractice insurance crisis," *id.* at 196, and that "the record support[ed] the conclusion that no alternative or less onerous method exist[ed]" for meeting that public necessity, *id.* at 197. This court reaches the same conclusion, adhering to the second prong of the *Kluger* analysis, first articulated in *Kluger* and reaffirmed in *Echarte*.

In an earlier case, the Florida Supreme Court reached a contrary result, finding unconstitutional a noneconomic damages cap in the Tort Reform and Insurance Act of 1986. *See Smith v. Dep't of Ins.*, 507 So. 2d 1080 (Fla. 1987). The court concludes, however, that *Smith* is distinguishable from the case at hand. In addressing the access to the courts challenge in *Smith*, the court relied solely on the first prong of *Kluger*, concluding that there was no reasonable alternative or commensurate benefit to justify limiting to $450,000 the previously unrestricted right to noneconomic damages in every tort case. *Id.* at 1088. The court distinguished *Lasky v. State Farm Ins. Co.*, 296 So. 2d 9 (Fla. 1974), in which it had previously upheld a provision related to the no-fault insurance scheme that prohibited recovery for pain and suffering unless the plaintiff met a $1,000 medical expense threshold as a prerequisite. The *Smith* court explained that the legislation in *Lasky* was constitutional because the statutory scheme provided a fair tradeoff between

the right to sue and the right to recover uncontested benefits, which amounted to a commensurate benefit under the first prong of the *Kluger* analysis. *See Smith*, 507 So. 2d at 1088. The *Smith* court could find no such tradeoff to justify the across-the-board tort limitation as a commensurate benefit in the 1986 legislation. Notably, the court did not address the second prong of *Kluger*, because the parties had not asserted that the all-torts cap was based on an overpowering public necessity. *See id.* at 1089. Here, to the contrary, the government asserts that an overpowering public necessity supports the caps and the legislature specifically identified a crisis affecting medical malpractice and healthcare in particular to justify the caps, placing the second prong of *Kluger* squarely at issue. Therefore, *Smith* does not control the decision in this case.

In this case, as in *Echarte*, it was well within the legislature's prerogative to impose reasonable damages limits in an attempt to address the "medical malpractice insurance crisis that threatens the quality and availability of health care for all Florida citizens." (Doc. 20-10, at 1.) *See White*, 323 So. 2d at 575 ("Changes in the elements of damage or the standards by which they are recovered under these circumstances is a legislative prerogative.").[39] The court concludes that because both factors of the second prong of the *Kluger* analysis are satisfied, the statutory limitation on noneconomic damages in wrongful death medical malpractice actions does not violate the right of access to courts under the Florida Constitution.

Equal Protection

The plaintiffs also challenge the caps on equal protection grounds under both the United States Constitution and the Florida Constitution. Under both constitutions, equal protection principles protect against invidious discrimination in legislation that, either by the language of [its] enactment or in [its] operation, create[s] classifications of individuals." *Ellis*, 3 So. 2d at 379. *See* U.S. Const. amend. XIV; Fla. Const. art. I, § 2. Equal protection requires that persons similarly situated be treated similarly. *Troy v. State*, 948

---

[39] While the court in *White* did not reference the constitutional access to courts provision, it expressly concluded that the changes in the elements of damages at issue did not violate the court's *Kluger* decision. *White*, 323 So. 2d at 575.

So. 2d 635, 645 (Fla. 2006), *cert. denied*, 551 U.S. 1135 (2007).  Although a state has broad power to make classifications in legislation, it may not do so on the basis of invidious discrimination against a particular class.  *See Levy v. Louisiana*, 391 U.S. 68, 71 (1968); *Gammon v. Cobb*, 335 So. 2d 261, 267 (Fla. 1976) (stating invidious discrimination violates both the federal and state constitutions).  Where, as here, the statute does not involve a suspect classification or a fundamental right, the right of equal protection is violated only if the statutory classification is arbitrary and unreasonable.[40]  See *Daniels v. O'Connor*, 243 So. 2d 144, 146 (Fla. 1971).  So long as there is a rational basis for the legislation, it will not be considered arbitrary or unreasonable.  In deciding whether a rational basis exists, courts will consider "(1) whether the statute serves a legitimate governmental purpose, and (2) whether it was reasonable for the [l]egislature to believe that the challenged classification would promote that purpose." *Hechtman v. Nations Title Ins. of N.Y.*, 840 So. 2d 993, 996 (Fla. 2003) (citing *W. & So. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648 (1981), and *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981)).  *See also F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993) (stating that under rational basis review, courts must uphold a statute against an equal protection attack if "there is any reasonably conceivable state of facts that could provide a rational basis for the classification").  The court's inquiry is at an end where the legislature has plausible reasons for the action.  *Beach Communications,* 508 U.S. at 313-14.  *Compare Daniels*, 243 So. 2d at 146 (stating a statutory classification survives if there is "a real and substantial relation" between the legislative purposes for the statute and the classification drawn).  This rational basis review gives "great latitude to the legislature in making classifications" in areas of social and economic legislation.  *Levy*, 391 U.S. at 71; *see also Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 83 (1978) (applying rational basis analysis to classifications in economic regulation).

---

[40]  The plaintiffs assert that the statutory noneconomic damages limitation is subject to strict scrutiny because it infringes on their fundamental right of access to the courts.  Based on the previous discussion rejecting the substance of their access to the courts claim, however, the court rejects their claim for strict scrutiny.

The plaintiffs first argue that it is not rational to aggregate their noneconomic damages claims under one monetary cap because each claimant has a separate and distinct cause of action. According to plaintiffs, the statute treats similarly situated wrongful death claimants differently because, they argue, a family with more survivors will receive less compensation for each family member than a family with fewer survivors, citing *St. Mary's Hosp., Inc. v. Phillipe*, 769 So. 2d 961, 972 (Fla 2000). This court concludes that although the statute at issue may have different practical effects on different sized families, it draws no distinctions based on the size of a family; the statute differentiates claims only on the basis of each occurrence of medical malpractice. *See* Fla. Stat. § 766.118(2)(a) (prefacing the statutory caps with the following language: "With respect to a cause of action for personal injury or wrongful death arising from medical negligence . . . ."). The Wrongful Death Act permits the personal representative to bring one action for the benefit of the estate and the survivors. Fla. Stat. § 768.20. Thus, one occurrence of wrongful death due to medical negligence gives rise to one cause of action for the benefit of the estate and the survivors. "[L]awmaking by its nature requires that legislatures classify and classifications by their nature advantage some and disadvantage others." *Van Der Linde Housing, Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293 (4th Cir. 2007). "The Constitution forbids only arbitrary differentiations among groups of persons who are similar in all aspects relevant to attaining the legitimate objectives of legislation." *Id.* Differentiating on the basis of an occurrence of medical negligence is not impermissible, and all families who have lost a loved one due to an occurrence of medical negligence are treated similarly.

As previously discussed, the Florida legislature had a rational and legitimate governmental purpose for this per-occurrence classification, i.e., the goal of making healthcare and professional liability insurance affordable and available by reducing the costs of malpractice insurance and the unpredictability of excessive noneconomic damages awards. The means chosen to achieve this goal – in part, the aggregate cap on noneconomic damages in medical negligence cases – is neither arbitrary nor unreasonable because limiting the amount of money available for each occurrence of medical negligence

furthers the goal of reducing costs and making the insurance risk more predictable.  *See*
*Hoffman v. United States*, 767 F.2d 1431, 1437 & n.7 (9th Cir. 1985).  "The very nature of
pain and suffering renders it incapable of measurement without speculation and
guesswork." *Franklin v. Mazda Motor Corp.*, 704 F. Supp. 1325, 1332 (D. Md. 1989); *see
also Arbino v. Johnson & Johnson*, 880 N.E.2d 420, 437 (Ohio 2007) ("One cannot deny
that noneconomic damages awards are inherently subjective and difficult to evaluate.").
Despite the fact that "the loss of a survivor is not diminished by the mere fact that there are
multiple survivors," *St. Mary's Hosp.*, 769 So. 2d at 971, the fact that this type of damages
is speculative in nature and subject to widely varying awards makes it reasonable for the
legislature to impose objective limits, even aggregate limits, in its attempt to control
malpractice insurance costs and, in turn, healthcare costs.  "Equal protection is not a
license for courts to judge the wisdom, fairness, or logic of legislative choices.  In areas of
social and economic policy, a statutory classification that neither proceeds along suspect
lines nor infringes fundamental constitutional rights must be upheld against equal
protection challenge if there is any reasonably conceivable state of facts that could provide
a rational basis for the classification." *Beach Communications*, 508 U.S. at 313.

The plaintiffs also assert the statute fails the rational basis test because there was
no factual basis for the legislature to conclude that limiting noneconomic damages to
$500,000 per claimant would accomplish the legislative goal of attracting and keeping
doctors in Florida or that it would actually reduce malpractice premiums.  They suggest that
the Florida legislature erroneously relied on the experience of damages caps in California,
arguing there exists evidence that other factors such as insurance regulation may have
been responsible for the lowered costs in California and the studies reviewing the effect
of caps are difficult to obtain and interpret.  Nonetheless, even if the plaintiffs' assessment
is accurate, the court concludes the statute is rationally related to a legitimate
governmental purpose, supported by an exhaustive report based upon testimony, studies,
and analysis on which the legislature could rely in making its policy decisions.  The
plaintiffs' arguments simply demonstrate the complexity of this issue and underscore the
array of policy choices considered by the legislature in reaching its decision.  That other

options were available and considered does not render the legislative findings clearly erroneous or irrational. "It is not the function of the courts to agree or disagree with whether the factual predicate actually exists, nor to quibble with the means selected by the legislature to accomplish its stated purpose for the challenged classification, so long as the classification is not wholly arbitrary." *Mizrahi v. N. Miami Med. Ctr., Ltd.*, 712 So. 2d 826, 830 (Fla. 3d DCA 1998), *cert. question answered and jmt. aff'd by* 761 So. 2d 1040 (Fla. 2000). "[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications,* 508 U.S. at 315. The court concludes that section 766.118(2), which limits and aggregates noneconomic damages in medical malpractice actions, does not violate equal protection under the United States Constitution.[41]

The plaintiffs assert that the Florida Supreme Court would find an equal protection violation under the Florida Constitution, relying on *St. Mary's Hospital*.[42] There, the court construed an earlier arbitration statue, Fla. Stat. § 766.207(7)(b) (1997), which limited noneconomic damages to "$250,000 per incident." The court found the 1997 arbitration statute ambiguous because it was not clear whether the cap should be applied to multiple claimants individually or in the aggregate. *St. Mary's Hosp.*, 769 So. 2d at 967-68. In *St. Mary's Hospital*, the court construed the ambiguous statutory language as applying to each claimant individually, noting that such an interpretation still met the statute's predictability goal, ensured that each claimant would be fairly and reasonably compensated for his or her pain and suffering, and was consistent with the principles of equity inherent in the distribution of noneconomic damages to survivors. *Id.* at 970. The court reasoned that in other contexts when the legislature intended to limit claimants' damages in the aggregate,

---

[41]   Similar malpractice limits on noneconomic damages frequently have been upheld against equal protection challenges in federal court. *See, e.g., Smith*, 419 F.3d at 519-20; *Boyd*, 877 F.2d at 1196-97; *Lucas v. United States*, 807 F.2d 414, 422 (5th Cir. 1986); *Hoffman*, 767 F.2d at 1434-37.

[42]   Notably, in the earlier case of *Echarte*, the Florida Supreme Court rejected without discussion an equal protection challenge to the noneconomic damages cap in the medical malpractice arbitration context. *Echarte*, 618 So. 2d at 191. The court also summarily considered and rejected claims that the arbitration damages caps violated due process rights, the right to trial by jury, the single subject requirement, the takings clause, or the nondelegation doctrine. *Id.*

it did so explicitly. *Id.* at 968. Also, the court considered that possible equal protection concerns might arise if the ambiguous statute was construed in a manner to require aggregation of the claims where the language of the statute did not require such a reading.[43] *Id.* at 972. Thus, the court construed the language it found to be ambiguous in a manner that would clearly avoid, rather than create, any possible constitutional concerns, as solid principles of statutory construction required. *See The Florida Bar v. Sibley*, 995 So. 2d 346, 350 (Fla. 2008) ("To the extent possible, courts have a duty to construe a statute in such a way as to avoid conflict with the Constitution."), *cert. denied*, 129 S. Ct. 1348 (2009).

Looking at the statute at issue in this case, the legislative intent is clear on its face – the cap is to be applied in the aggregate per occurrence of medical negligence, regardless of the number of claimants or defendants. The limitation is rationally related to the legislature's intended purpose, part of which is to control the cost of liability insurance for medical care providers by making noneconomic damages awards more predictable. A per-occurrence cap will necessarily result in less cost to insurers with greater ability to predict claims than exists with a per-claimant cap. Although the Florida Supreme Court expressed in *St. Mary's Hospital* that a per claimant cap would also sufficiently achieve the legislative goal of improving risk assessment for medical malpractice claims, *id.* at 970, it is equally reasonable to conclude that a per occurrence cap would go farther to advance that goal. In any event, a policy choice between two reasonable means of achieving a legislative goal is a choice for the legislature, not the courts. As long as the statutory classification "rest[s] on some difference that bears a just and reasonable relation to the

---

[43]     As an example, the court compared the situation where a wife dies leaving only a spouse to that of a wife who dies leaving a spouse and four minor children. In the latter instance, the five survivors must share the total amount of the cap, whereas in the former instance, the one survivor has the benefit of the entire amount. *St. Mary's Hosp.*, 769 So. 2d at 972. In the situation involving several claimants, the court said that construing the limit to apply in the aggregate would "offend[] the fundamental notion of equal justice under the law and can only be described as purely arbitrary and unrelated to any state interest." *Id.* Bound to resolve all doubts in favor of the statute's constitutionality, the court concluded that the noneconomic damages cap which applied "per incident" must be construed to apply to each claimant individually. This discussion is dictum, however, and in this court's view, should not form the basis for a decision by this court declaring an act of the state legislature unconstitutional under the state constitution.

statute in respect to which the classification is proposed," the statute is reasonable. *Rollins v. State*, 354 So. 2d 61, 63 (Fla. 1978). Here, all plaintiffs are treated similarly in that whenever a family member has died on account of a practitioner's medical negligence, the personal representative may bring a wrongful death action on behalf of the survivors and may recover an award up to $1 million for noneconomic damages to distribute among them, subject to a $500,000 cap on individual claimants and the $1 million cap collectively. In this fashion, although the number of survivors may vary with each occurrence of medical negligence, the insurance risk remains predictable. As noted, the judiciary does not "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Fla. Patient's Comp. Sund v. Von Stetina*, 474 So. 2d 783, 789 (Fla. 1985) (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)). The plaintiffs have failed to overcome the presumption of constitutionality, which "survive[s] unless the challenging party proves beyond a reasonable doubt that the statute is unconstitutional– that there is no conceivable factual predicate to support the classification the statute contains." *Mizrahi*, 712 So. 2d at 829 (citing *Gluesenkamp v. State*, 391 So. 2d 192, 200 (Fla. 1980)). This court cannot conclude that the Florida legislature's choice of an aggregate cap is arbitrary or irrational in violation of the Florida Constitution, and absent more definitive guidance from the Florida Supreme Court, this court will not presume from dictum that it would declare the statute here unconstitutional under the Florida Constitution, particularly where, by contrast, the statute at issue here, enacted in 2003, *explicitly* applies in the aggregate.[44]

Other Constitutional Claims

Plaintiffs also assert that the noneconomic damages limitation is unconstitutional under Florida's doctrine of separation of powers as an impermissible form of legislative remittitur. *See* Fla. Const. article II, § 3. The court disagrees. The legislation at issue does not impermissibly interfere with the function of the judiciary. *See Simmons v. State*,

---

[44] Section 766.118(2), at issue here, provides: "With respect to a cause of action" for medical negligence, noneconomic damages are limited to "$500,000 per claimant" or $1 million "regardless of the number of claimants" and "recoverable by all claimants . . . in the aggregate."

36 So. 2d 207, 208 (Fla. 1948) (stating any legislation that hampers or interferes with the function of the judiciary is unconstitutional).  The statute defines the substantive and remedial rights of the litigants.  Courts may still grant a further remittitur if it is deemed appropriate, and the limit on the amount of noneconomic damages available to survivors of a wrongful death does not equate with directing the outcome of a case.

The plaintiffs also argue that the noneconomic damages limitation is a government taking of property without just compensation in violation of due process and eminent domain.  *See* U.S. Const. amend. XIV; Fla. Const. art. I § 9; Fla. Const. art. X § 6.  The government is prohibited from taking private property, unless it is taken for public use and just compensation is given.  *See Ellis*, 3 So. 2d at 380.  The damages caps were in existence prior to the time the medical negligence occurred in this case so there was no taking or vested right in the traditional sense.  *Compare Raphael v. Shecter*, No. 4D08-432, 2009 WL 3018157, at *1 (Fla. 4th DCA Sept. 23, 2009) (concluding the noneconomic damages caps of Fla. Stat. § 766.118(4) could not be applied retroactively to limit noneconomic damages where injury occurred prior to the statute's enactment).  A vested right must be "more than a mere expectation based on an anticipation of the continuance of an existing law."  *Clausell v. Hobart Corp.*, 515 So. 2d 1275, 1276 (Fla. 1987), *cert. denied*, 485 U.S. 1000 (1988).  It is well-settled that "[n]o person has a vested interest in any rule of law to insist that it shall remain unchanged for his benefit."  *New York Cent. R.R. v. White*, 243 U.S. 188, 198 (1917).  "Florida law is well established that the right to sue on an inchoate cause of action – one that has not yet accrued – is not a vested right because no one has a vested right in the common law, which the Legislature may not substantively change prospectively."  *Raphael*, 2009 WL 3018157, at *3 (internal marks omitted).  In this case, the prospective legislative change occurred 2003, well before any right to sue arose out the medical negligence in 2006 that resulted in Michelle's death.  *See id.* at *4 (stating a cause of action for negligence accrues when the injury is inflicted).

The court summarily rejects the plaintiffs' remaining arguments.  The plaintiffs lack standing to assert that this legislation under compensates the most severely injured or

discriminates on the basis of disability, and their claim that the statutory language is void for vagueness lacks merit.

Accordingly, Plaintiffs' motion for partial summary judgment is DENIED.

**CONCLUSION**

Based upon the law, the evidence and testimony presented at trial and duly considered by the court, it is hereby ordered as follows:

1. Final judgment is entered in favor of the decedent's co-personal representatives and against the Government in the total amount of $1,980,462.40, to be distributed to the beneficiaries of the estate as follows:

    a. To Jason Walley for the benefit of W.W.:

        Loss of past and future household and related services: $705,234.00

        Loss of financial support: $235,000.00

        Noneconomic damages: $250,000.00[45]

    b. To the Estate of Michelle McCall:

        Loss of net accumulations, reduced to present value: $30,752.40

    c. To Edward M. McCall, II:

        Funeral expenses paid: $9,476.00

        Noneconomic damages: $375,000.00[46]

    d. To Margarita F. McCall:

        Noneconomic damages: $375,000.00[47]

2. Costs are to be taxed against the Government.

---

[45] The court awards $500,000.00, but caps it at $250,000.00 to meet the aggregate noneconomic damages cap of Fla. Stat. § 766.118(2)(b), (c).

[46] The court awards $750,000.00, but caps it at $375,000.00 to meet the aggregate noneconomic damages cap of Fla. Stat. § 766.118(2)(b), (c).

[47] The court awards $750,000.00, but caps it at $375,000.00 to meet the aggregate noneconomic damages cap of Fla. Stat. § 766.118(2)(b), (c).

3.  The plaintiffs' motion for partial summary judgment is DENIED.


**DONE and ORDERED** this 30th day of September, 2009.



_s/ M. Casey Rodgers_
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**